(No. 6979. July 14, 1942.)

GUNDER BIRKELAND, Respondent, v. CLEARWATER CONCENTRATING COMPANY, INC., a corporation, Appellant.

[127 Pac. (2d) 1047.]

C. H. Potts and W. H. Smiley for appellant.

Cox, Ware & Stellmon for respondent.

AILSHIE, J. — Appellant, Clearwater Concentrating Company, a corporation organized and existing under the laws of the State of Washington, was doing business in Idaho in full compliance with the state laws. C. G. Hage and C. H. Netheway were president and secretary, respectively, of the company. The Union Iron Works of Spokane, (hereinafter referred to as the Iron Works) was a corporation organized under the laws of Washington, with F. D. Williamson as its sales manager. Respondent, Gunder Birkeland, was a builder, also engaged in the investment business, took mortgages and bought real estate contracts.

This case involves the ownership and sale of certain mining machinery and equipment, sold originally by the Iron Works to the Argenta Consolidated Mining Co., and shipped to the mill of the latter company at Argenta, Montana. The price of the equipment, to the Argenta Company, was approximately $14,000, f.o.b. plant of the Iron Works. The Argenta Company got into financial difficulty and owed personal property taxes against the machinery, which Williamson paid. The Iron Works repossessed the mill in Montana.

During the summer of 1938, Williamson discussed with Netheway the proposition of the latter's company buying the mill, suggesting that Netheway "have it for the remaining portion of the unpaid conditional sales contract"; Nethe-

way gave a check for $500 and later a second check for $1,000, making a total payment of $1500; and the remaining portion was left at "about $6500". Date of this transaction was June 11, 1938. The mining equipment was hauled from Montana to the warehouse of the Iron Works at Spokane and held there "for the payment of the balance."

In October, 1938, Netheway consulted Birkeland about making a loan of $10,000, to pay off the balance due on the equipment purchased by the concentrating company (appellant) and bill for hauling the equipment. Netheway, Hage and Birkeland inspected the millsite at Elk City, Idaho, and the equipment at Spokane. As a result of the conferences, Birkeland negotiated a loan to appellant of $6,774.35 ($5,000 of which was to be paid to the Iron Works and $1,774.35 to a drayage company for hauling equipment to Washington and thence to Idaho.) The Concentrating Company gave Birkeland a note for $8500 and $100,000 shares of its capital stock.

November 5, 1938, *bill of sale from the Iron Works to the appellant* was executed, showing receipt of $1500 and a balance owing of $5,000; by letter of November 8th, the Iron Works requested the First National Bank of Everett, Wash., to deliver the bill of sale to Netheway or his associates, upon payment of $5,000 to the credit of the Iron Works.

In making this loan to the company, Netheway, Hage and Birkeland were informed by Attorney Ferguson that it would involve usury; that the only way to make this loan would be to forward a written letter to the Iron Works, stating the appellant company was unable to pay the balance due on the machinery; then Birkeland could buy the machinery from the Iron Works and sell it back to the company on a conditional sale contract, with monthly payments. Accordingly, November 8, 1938, Netheway wrote to the Iron Works, informing them of the inability of the Concentrating Company to raise $5,000, due on equipment, and releasing all claim against the equipment. November 11, 1938, another bill of sale was executed by the Iron Works, conveying to Birkeland the mining equipment for the consideration of $5,000.

November 14, 1938, by letter from the Iron Works to the National Bank of Commerce of Seattle, bill of sale, for the mining equipment, was to be delivered to Birkeland,

on payment of $5,000 and signing the release by the Concentrating Company.

November 22, 1938, "Conditional Bill of Sale" was executed by *respondent to appellant*, specifying consideration as $8,500, with interest at 6% providing for monthly payments, beginning with January, 1939. Simultaneously with the execution of this latter sales contract, appellant company executed and delivered to Birkeland an assignment of lease and a negotiable promissory note secured by mortgage, as additional security for the payment of the $8500 note which covered the purchase price of the personal property, transportation and other charges.

In February, 1939, the machinery was moved to Elk City (Orogrande Mining District, 55 miles southeast of Grangeville). Netheway installed the machinery, constructed the mill, and got it into operation. The mill remained in operation for about sixty days, finally closing down in August, 1939, about the time this action was commenced. Payments were made on the equipment, for the months of January to and including May, 1939, amounting to the sum of $1,531.78 (principal and interest). No further payments were made on the contract.

In the meanwhile, June 8, 1939, respondent addressed a letter to Hage and Netheway, asking that they meet with him in Seattle, for a conference over surrendering the 100,000 shares of stock of the Concentrating Company. The following day, William Henderson, Seattle industrial engineer and accountant, employed by the Concentrating Company, wrote to Israel Nelson, attorney, advising that, unless the 100,000 shares of stock were turned over to Henderson's attorney by June 12th, the deal would be off and the Concentrating Company would not make any further payments to Birkeland on his loan. June 14th a release was executed by the company, consideration for which was the surrender of the 100,000 shares of stock by Birkeland "in exchange for a certificate of stock in a lesser amount."

June 27, 1939, 30,000 shares of stock were delivered to Birkeland, together with a note for $2500 signed by Hage and Netheway; and the 100,000 shares of stock were surrendered and agreement made, extending time for payment of note, from June 10, 1939, to January 10, 1940.

This action, in claim and delivery, was instituted August 26, 1939, by plaintiff, to recover possession of the personal

property held by defendant, or for the sum of $3,000, the alleged value thereof, in case delivery cannot be had. Affidavit, required by statute, was filed on behalf of appellant and request was made of the sheriff to take the property from defendant's possession and hold the same as required by law. Thereafter request for return of the property to defendant was made. As an affirmative defense and cross-complaint, defendant alleged that all transactions in this matter and demands were made in the state of Washington; that, on the loan to cross-plaintiff, cross-defendant secured to himself a greater interest rate than 12%, in violation of secs. 7300, 7304, Remington's Rev. Stat. of Wash., thereby forfeiting all claim, right or demand he may have against the cross-plaintiff. The allegations of the cross-complaint were denied by plaintiff. From a judgment in favor of plaintiff, and against the defendant, adjudging plaintiff to be the owner and entitled to the immediate possession of the property; and from the order dismissing the cross-complaint of defendant with prejudice, and awarding costs in plaintiff's favor, defendant has appealed.

The "Conditional Bill of Sale" contained, among other things, the following provisions:

"(1)  Said property is now and shall remain the absolute property of vendor until after the full and complete payment of the purchase price therefor, which purchase price is the sum of Eighty-Five Hundred ($8,500.00) Dollars . . . .

"(3)  That the vendee shall execute and deliver to the vendor by way of collateral and additional security for the payment of the purchase price herein mentioned, a certain promissory note and Assignment of Lease and Mortgage of even date herewith, assigning the vendee's interest as lessee and/or purchaser, by way of mortgage, under a certain Lease and Option for sale and purchase made between Claus J. Breier and Nell Breier, his wife, and Earle W. Morgan and Grace A. Morgan his wife, as vendors and Clearwater Concentrating Company, Inc., as purchaser, which said Lease and Option is registered with the County Auditor of Idaho County, Idaho, . . . .

"It being the intention of the parties hereto that the said property covered by the within Conditional Sales Agreement shall be installed and used upon the said lands and milling site."

Apparently, after the execution of this Conditional Bill of Sale, and on the same date, an instrument was executed and acknowledged by the appellant company's officers, designated "Assignment of Lease and Mortgage." This latter instrument is in fact a mortgage covering mining property, consisting of locations, fixtures, equipment, machinery, and personal property located on the claim, *including* the property covered by the conditional bill of sale.

This document also embraces an assignment of the *lease and option* to purchase the mining property, as above indicated by excerpt from Bill of Sale previously given appellant by the owners of the mining claims. In other words, the mortgage covers the leasehold estate held by appellant company, also included an assignment of its option to purchase the mining property, and contains, *inter alia,* the following:

"AND WHEREAS, It has been expressly agreed between the mortgagor and mortgagee that all of said mill, machinery and equipment, and in addition thereto all other milling machinery and equipment, whether already on the mortgagor's property hereinafter described, or that may be brought thereon hereafter, and whether purchased from the mortgagee or not, and either loose or actually affixed to the freehold, *shall be deemed to be fixtures and as such to form part of the freehold and to be included in the security hereby granted,* PROVIDED HOWEVER, *that nothing herein contained shall, nor shall it be deemed to prejudice or in any way affect the rights and remedies of the mortgagee, conferred upon him under and by virtue of said conditional sales contract, or expressly or as a matter of law, all such rights and remedies being hereby expressly reserved to the mortgagee;* it being further expressly agreed between the parties hereto that the giving of these presents shall not create nor be deemed a merger of securities, and that the mortgagee may pursue all or any of his remedies under either the said Conditional Sales Contract or the within security, or under both, together or separately, in his. absolute and unfettered discretion.

. . . . . .

"And it is further agreed that the taking of a judgment or judgments on any covenants herein contained shall not operate as a merger of the said covenants or affect the

mortgagee's right to interest at the rate and times aforesaid." (Italics ours.)

The sole question for determination on this appeal is: Was *title* to the property in question vested in appellant or in respondent when this action was instituted.

From the facts and circumstances of the whole case, the following conclusions seem to unavoidably arise: (a) Appellant made and delivered, and respondent received and accepted, a negotiable promissory note for $8500 ($3500 more than balance due on purchase price), containing no mention of a title-retaining contract; (b) respondent paid the Iron Works $5,000, balance due on purchase price to the Iron Works and $1774.35 for transportation of the property sold; and it is not clear (but is immaterial for the present consideration) what became of the balance of $1725.65 covered by the note; (c) appellant executed and delivered, and respondent accepted, a mortgage securing the payment of $8500, the full face of the note, bearing interest, and a certificate for 100,000 shares of appellant's capital stock; (d) contemporaneous with the foregoing transactions, the "Conditional Bill of Sale" was signed by both appellant and respondent.

Appellant's contention is that the whole completed transaction amounted to a sale and delivery to appellant; and that payment was made therefor by the delivery of the negotiable note, mortgage, and certificate for 100,000 shares of its capital stock.

In support of respondent's contention, that the sale was only conditional, we are cited to cases from various jurisdictions and special reliance is placed on the case of *Sparkman v. Miller-Cahoon*, 48 Ida. 254, 282 Pac. 273; (see 95 A.L.R. 333). That case, however, does not support respondent's contention, under the facts of the present case, where the mortgage was taken on the *same property sold*. Such a condition was anticipated in the opinion in the Sparkman-Miller-Cahoon case. After reference to some cases cited, supporting present respondent's position, the opinion says:

"The other cases have to do with mortgages given on *the specific goods themselves;* and correct they are, since title can not rest in vendor and vendee at one and the same time." (Italics supplied.)

The latter case is cited on this point, with comment by the annotator, in note to *Maxcy-Barton Organ Co. v. Glenn*

*Bldg. Corporation*, 355 Ill. 228, 189 N.E. 326, 95 A.L.R. 321, 333. In discussing the rule here involved, the author, Mr. Dwyer, says:

"It is frequently stated that there is a conflict of authority on the question of the effect, upon a conditional sale, of the taking of a chattel mortgage on the same property. An examination and analysis of the cases dealing with the question, however, reveal that the conflict is more apparent than real, and that, as a matter of fact, the authorities are overwhelmingly one-sided.

"It is generally agreed, with respect to the difference in the nature of the security between a conditional sale and a chattel mortgage, that the security reserved under a conditional sale consists in the title to the property, while the security created by a chattel mortgage consists in a lien interest only. Thus viewed, it would seem that there is a necessary inconsistency between the two types of security, and that it is inherently impossible for the two to stand together. It is clear that the title cannot be in two places at the same time; if it is in the seller, it cannot be in the buyer, and, if in the buyer, it cannot also be in the seller. This inconsistency between conditional sales and chattel mortgages would seem to require that a chattel mortgage taken subsequently to a conditional sale on the same property must necessarily supplant the conditional sale. Surely, a person cannot hold title to property and at the same time be a chattel mortgagee of the same property."

It is immaterial, in the determination of this case, whether this machinery and equipment became in fact a part of the fixtures attached to the real property, for the reason that the mortgage covered the *real property, fixtures and all personal property on the mining claims, mill and millsite;* and the effects of the stipulation in the conditional bill of sale and the mortgage, as to third parties, strangers to the contract, are not here in question.

■ Some of the stipulations of the "Conditional Bill of Sale", authorizing diverse suits, waivers, and remedies, are in conflict with the provisions of sec. 9-101, I.C.A., which provides:

"There can be but one action for the recovery of any debt, or the enforcement of any right secured by mortgage upon real estate or personal property, which action must be in accordance with the provisions of this chapter."

The statute prohibits the prosecution of any action for the recovery of a *debt that is secured by mortgage* in any other manner or form than by foreclosure action, under chapter 1, title 9 of the code. (*Rein v. Callaway*, 7 Ida. 634, 65 Pac. 63; *Berg v Carey*, 40 Ida. 278, 281, 232 Pac. 904; *Portland Cattle Loan Co. v. Biehl*, 42 Ida. 39, 45, 245 Pac. 88; *Berry v. Scott*, 43 Ida. 789, 792, 255 Pac. 305; *Garrett v. Soucie*, 46 Ida. 289, 293, 267 Pac. 1078; *Jeppesen v. Rexburg State Bank*, 57 Ida. 94, 101, 62 Pac. (2d) 1369; *Brockman v. Caviness*, 61 Ida. 254, 259, 100 Pac. (2d) 946.)

Some of the above quoted stipulations were inserted in the sale contract, either in ignorance of the provisions of our statute or for the purpose of avoiding or circumventing the statute. The execution and delivery of a negotiable promissory note, containing no reference to any conditional sale contract, and then securing it by mortgage on real and personal property, was an evidence of indebtedness; and the note was calculated to pass into the hands of innocent purchasers, at its full face value, and was wholly in conflict with the theory and contention, that the title to the property, or any part thereof covered by the mortgage, rested in the mortgagee. Furthermore, the note provides that the venue, in case of suit, may be in King County, Washington; whereas, the property mortgaged was located in Idaho County, Idaho. It must be remembered that, in this case, the promissory note executed and delivered by appellant, was not a "title retaining note." It bore on its face no evidence of the character of transaction out of which it arose.

In *Mark Means Transfer Co. v. Mackinzie*, 9 Ida. 165, 73 Pac. 135, this court held that the commencement of an action to recover a balance due on a conditional sale contract vested title to the property in the vendee. By parity of reasoning, it would seem that the taking of a mortgage on the same property, to secure the indebtedness, would have the same effect. (Followed in *Peasley v. Noble*, 17 Ida. 686, 692, 107 Pac. 402; *Utah Implement Vehicle Company v. Kesler et al.*, 36 Ida. 476, 211 Pac. 1079.)

In *Barton v. Groseclose*, 11 Ida. 227, 81 Pac. 623, following the Mark Means case, the court held that, in the commencement of an action for the balance due on conditional sale contract, plaintiff could not have an attachment under the statute.

Respondent could not "both eat his cake and have it."

Many cases have been cited, able and exhaustive arguments have been made dealing with various ramifications of the main issue here involved, but we deem it unnecessary, if not improper, for us, at this time, to discuss or consider other questions than those herein covered.

We have reached the conclusion that the judgment must be reversed and the cause remanded to the trial court.

In order to avoid further complications, which otherwise might arise, we have concluded that the respondent should be allowed to amend his complaint, if he desires to convert his action into a suit in foreclosure.

Costs awarded to appellant.

Budge, Morgan and Holden, JJ., concur.

Givens, C. J., concurs in conclusion.