R. B. FRASER and ROSABELLE FRASER, Plaintiffs and Respondents, v. E. C. CLARK and EVAN OWENS, Defendants and Appellants.

No. 9522.
Submitted March 18, 1955. Decided April 5, 1955.
282 Pac. (2d) 459.

Mr. G. J. Jeffries, Roundup, Mr. Howard C. Gee, Lewistown, for appellants.

Mr. Ralph J. Anderson, Mr. Stanley P. Sorenson, Helena, for respondents.

Mr. Gee, Mr. Jeffries, and Mr. Anderson argued orally.

MR. CHIEF JUSTICE ADAIR:

This is an appeal from an order refusing to dissolve an attachment.

On February 18, 1954, R. B. Fraser and Rosabelle Fraser, plaintiffs, commenced in the district court of Yellowstone County this action against E. C. Clark and Evan Owens, defendants, to recover a money judgment for $28,500 with interest as well as interest on a larger sum alleged to be owing to plaintiffs from the defendants.

At the time of issuing summons the plaintiffs obtained a writ of attachment out of the district court of Yellowstone County and on February 20, 1954, by virtue thereof personal property belonging to defendants and situate in Fergus County was seized. The property attached then consisted of approximately 394 head of thoroughbred Hereford cattle, 11 head of horses, various automobiles, trucks, tractors and other ranch machinery and equipment.

On defendants' timely motion the Honorable Guy C. Derry, judge presiding in the district court of Yellowstone County, ordered a change of venue to the district court of Fergus County which order, on appeal, this court affirmed. See Fraser v. Clark, 128 Mont. 160, 273 Pac. (2d) 105.

On defendants' petition the Honorable Stewart McConochie, the duly elected judge of the district court of Fergus County, on August 6, 1954, made an order releasing from the attachment a part of the property consisting of 36 head of dry 2 year old heifers, 11 head of horses and certain automobiles, trucks, tractors and ranch machinery and equipment such release being on the ground that the value of the property attached is greatly in excess of the amount for which the levy should properly have been made.

Thereafter on September 14, 1954, on defendants' petition, the district court issued an order returnable on a day certain directing plaintiffs to show cause why the attachment should not be dissolved.

On September 21, 1954, plaintiffs disqualified Judge McConochie whereupon the Honorable Victor H. Fall, one of the judges of the district court of the first judicial district, was called in, assumed jurisdiction and after hearing had, disallowed defendants' petition to discharge the attachment. Defendants, without success, attempted to have this court review such order in an original proceeding for supervisory control. See State ex rel. Clark v. District Court, 128 Mont. 526, 278 Pac. (2d) 1000.

Thereupon defendants appealed from the order refusing to dissolve the attachment as is provided for in R. C. M. 1947, sec. 93-8003, subd. 2, sec. 93-8004, subd. 3, and sec. 93-8005.

On defendants' application and because of the absence from Montana of the Honorable Victor H. Fall, the district judge presiding at the hearing on defendants' motion to dissolve the attachment, this court on February 10, 1955, appointed Aaron R. Shull, Esq., a member of the bar of this court, as referee to act in the place and stead of Judge Fall in the preparation and certification of the record on appeal herein.

*On Motion to Strike.* On February 21, 1955, the transcript on appeal, duly certified by such referee was filed in the office of the clerk of this court following which the plaintiffs interposed a motion for an order striking the transcript from the records and files of this court urging that such transcript was not prepared, certified or served as provided either by statute, court rule or court order and claiming that plaintiffs were afforded ''no opportunity to propose amendments to or to raise objections to any portion of this said purported record on appeal.'' Plaintiffs have not filed any suggestion of diminution of record, Court Rule VI, subd. 5, nor have they otherwise challenged the accuracy of the certified report of the proceedings had before Judge Fall and having failed to show that any prejudice has or will result to them through the acceptance by this court of such transcript, plaintiffs' motion to strike same is disallowed.

*On the Merits.* The defendants, E. C. Clark and Evan Owens, owners of a large herd of purebred Hereford cattle in Nebraska,

were desirous of acquiring sufficient suitable land in Montana to accommodate the needs of their herd which defendants were anxious to move to Montana.

The plaintiff, R. B. Fraser, claimed to own certain ranch land in Fergus County, Montana, suitable to meet defendants' requirements and one Emery Lupton of Western Inc. & Morg. Co., acting as the purported agent of Fraser contacted defendants following which defendants paid the sum of $15,000 as a deposit and earnest money on the total purchase price of $150,-000 for lands, not described by section, township and range, but situate in Fergus County and designated as the ''R. B. (Bob Fraser) Ranch'', the transaction being evidenced by an instrument in writing signed by the parties and reading:

FORM No. 740
Copyright, 1949
Stevens-Ness Law Publishing Co.
Portland, Ore.

OFFICIAL FORM OF THE MONTANA
ASSOCIATION OF REALTORS

## RECEIPT AND AGREEMENT TO SELL AND PURCHASE

Billings , Montana, Dec. 30 , 19 52

RECEIVED FROM Clark & Owens

(hereinafter referred to as Purchaser)

the sum of Fifteen Thousand------------------------------Dollars ($ 15,000.00) as a deposit and earnest money in

part payment of the purchase price of the following described real property situated in

State of Montana, County of Fergus

A. R. to-wit: (Bob Fraser)Ranch located NE of Grassrange,Mont. It is understood that there are about 1500 acres of deeded land in the North pasture. It is understood that there are about 3700 acres in this pasture. Whatever leased land that is situated with in the boundaries of this fence is leased from Mr. Smith for $100 a year. If in the opinion of the purchaser there isn't enough leased land then Mr. Fraser will arrange to lease a joining pasture of about 2,000 acres for the purchaser or if this land cannot be leased then Mr. Fraser will lease some of his land to the north to the purchaser. It is understood that there are approx.2,680 acres of deeded land and about 1,280 acres of leased land in the home unit or whatever land that is within the fences goes. 1/2 of all oil and mineral rights owned by Mr. Fraser are to be transferred with sale.This includes 1/2 of oil lease money. none

together with all irrigation fixtures and equipment, plumbing and heating fixtures and equipment, including stoker and oil tanks, water heaters and burners, electric light fixtures (excluding bulbs), bathroom fixtures, roller shades, curtain rods and fixtures, venetian blinds, window and door screens, linoleum, all shrubs and trees, and all other fixtures attached thereto, except none

are to be left upon the premises as a part of the property purchased.Together with the following specified personal property Mr. Fraser agrees to finish the house in 1st class order, move log house and fix the outside wiring.

It is hereby agreed that the total purchase price is the sum of One hundred fifty thousand----Dollars ($ 150,000.00

payable as follows: The earnest money hereinabove receipted for in the sum of by check Dollars ($ 15,000.00

and the balance of the purchase price in the sum of Dollars ($

to be paid as follows: (If on contract, state terms generally and if escrow, also name of escrow holder) A total of 29% to be paid down. The $15,000 earnest money payment held in escrow to be turned to R.B Fraser as soon as he shows good title to the land.The rest of the down payment of $28,500 to be paid to Mr. Fraser after purchaser's attorney has had opportunity to check the legal papers. Balance to be paid at the rate of 1/2 of Gross income from ranch each year.Real Estate Taxes canbe deducted first.

1. It is further agreed: Seller shall at his expense furnish Purchaser an Abstract of Title continued to a date subsequent hereto showing merchantable title to

liens and encumbrances, except none, interest rate to be 5% annually, interest to start March 1st 1953. Purchaser will pay the earned interest on Dec. 15th 1953.

1. It is further agreed that the broker assumes no responsibility in regard to the title and broker recommends that Purchaser have an Abstract of Title or Title Insurance Policy examined by an attorney.

2. The real property is to be conveyed by _____ contract for deed _____ and the personal property by Bill of Sale, free and clear of all encumbrances except building and zoning ordinances and regulations, building and use restrictions, rights of way and easements, reservations in Federal patents and State deeds and those enumerated in Section 1 above.

3. Seller shall pay all of the taxes and assessments for _____ and prior years and Purchaser shall pay all taxes and assessments thereafter.

Rents, Insurance and interest on mortgage or contract indebtedness shall be pro-rated as of _____ March 1st, 1953
Encumbrances to be discharged by Seller may at his option be paid out of the purchase money at the date of closing.

4. If Seller does not approve this sale within _____ 1 _____ days hereafter, or if Seller's title is not merchantable or insurable and cannot be made so within a reasonable time after written notice containing statement of defects is delivered to Seller, then said earnest money herein receipted for shall be returned to the Purchaser on demand and all rights of Purchaser terminated unless Purchaser waives said defects and elects to purchase, but if said sale is approved by the Seller and Seller's said title is merchantable or insurable and Purchaser neglects or refuses to complete the purchase or shall fail to pay the balance of the purchase price as hereinabove provided, then said earnest money shall be forfeited to the Seller as liquidated damages and not as a penalty and this Agreement thereupon shall be of no further force or effect.

5. Possession shall be delivered Purchaser on or before the _____ 1st _____ day of _____ April _____, 19 53.

6. Purchaser enters into this Agreement in full reliance upon his independent investigation and judgment and there are no verbal or other agreements which modify or affect this Agreement. Purchaser's rights herein are not assignable without the written consent of the Seller

7. Time is of the essence of this Agreement.

8. Special provisions: Mr Fraser will give a perpetual easement for use of stock water from the creek that runs through land owned by him in the N 1/2 of NW 1/4 of Section 19, Range 23E and Township 15 N.

Western Inc. & Mortg. Co. Agent. By /s/ Emery Lupton _____ Agents for _____ R. B. Fraser _____ Seller

I hereby agree to purchase the above described property and pay the price of _____ One Hundred Fifty Thousand _____ Dollars ($150,000.00) as set forth above and grant to said agent. _____ 1 _____ days hereafter to secure Seller's acceptance hereof, during which period my said offer shall not be subject to revocation. I/we hereby acknowledge receipt of a copy of this Receipt and Agreement to Sell and Purchase, bearing the Agent's and my/our signatures.

Address _____ Harrison, Nebr.

Phone _____ 4651

By _____ /s/ Clark & Owens _____

_____ /s/ E.C.Clark _____ Purchaser

For valuable consideration I/we agree to sell and convey to the Purchaser the above described property on the terms and conditions hereinabove stated and agree to pay to the above named agent a commission amounting to _____ five per cent of the above mentioned selling price for services rendered in this transaction, in the event of forfeiture of the deposit as above provided, the said deposit shall be paid to or retained by the agent to the extent of the agreed upon commission, with residue to the seller. I/we authorize and direct the payment out of the cash proceeds of sale of the expense of furnishing evidence of title, cost of recording fees and revenue stamps, if any, as well as any incumbrances on said premises payable by me at/or before closing. I/we acknowledge receipt of a copy of this Receipt and Agreement bearing my/our signature and that of the Purchaser named above.

Dated this _____ day of _____, 19 _____.

Address _____ /s/ R. B. Fraser _____ Seller
_____ (If husband and wife both must sign.)

SELLER'S COPY

C A

Supplement to Receipt and Agreement to Sell and Buy dated Dec. 30, 1952.

"1— It is agreed that purchaser can sell cattle for the sole purpose of buying replacement stock of the same value without applying toward the ½ of the sales price for the ranch payment.

"2— Contract for deed and other legal papers will be held in escrow at the Security Trust and Savings Bank of Billings, Mont. and payments will be made there.

"3— If the purchaser wishes, R. B. Fraser will leave the stack of loose hay located South of the road for the purchaser to use in the Spring of '53. Whatever amount of hay that purchaser uses he agrees to repay in a like amount of hay to R. B. Fraser in the Fall of 1953.

"4— Permanent improvements agreed upon with Mr. Fraser can be deducted from Fraser's ½ of payments. This payment does not decrease the *principle*.

"5— In-as-much as the income will be small from the Grassrange property in 1953, Mr. Clark agrees to pay ½ of the proceeds from the sale of cattle left in Nebraska after shipping the rest of the cattle to Grassrange, Mont.

"6— Fencing material on the property is to be left.

"7— House to be completed by May 1st, 1953, if at all possible, and at least the top floor by April 1st, 1953.

> "/s/ Clark & Owens
> "By /s/ E. C. Clark
> "/s/ R. B. Fraser (Seller)"

Plaintiffs and defendants also signed a "Contract for Deed" dated December 30, 1952, and comprising eleven separately numbered paragraphs relating to the sale of the property which, in part, provide:

"* * * the consideration * * * shall be the sum of One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) * * * of which * * * Fifteen Thousand and 00/100 Dollars ($15,-000.00) has been this day paid, and that the balance * * * shall be paid as follows, to-wit: Twenty-Eight Thousand Five Hundred and 00/100 Dollars ($28,500.00) when the obligations, as

to title, under paragraph 3 of this contract have been met, and the sum of One Hundred Six Thousand Five Hundred and 00/100 Dollars ($106,500.00) as follows, viz.:—

"Annually and before the close of each calendar year, and commencing in the month of December, 1953, the Vendees shall account fully to the Vendors for the operations of the said Vendees upon the property sold hereunder, providing in this connection full financial data and records and receipts that shall be available for examination by any accountant designated therefor by the Vendors, and that upon the approval by such accountant of the report of the Vendees, and the establishment of the gross earnings of the Vendees, the said Vendees shall immediately and forthwith pay to the Vendors one-half (½) of the gross income derived from the operation of the said property to be applied as a payment as of that time upon the said purchase price, after first deducting therefrom the amount of the real estate taxes assessed against the said property for the current calendar year, which taxes the Vendees shall pay annually, when due and before delinquency, during the continuance of this contract and shall provide the Vendors with receipts therefor of the proper county treasurer; and it is understood and agreed in connection with the payment of the said purchase price, that the full amount thereof shall draw interest at the rate of five per cent (5%) per annum, payable annually, from March 1, 1953, and that the accrued interest on the purchase price shall be payable December 15, 1953, and annually thereafter.

"And it is expressly covenanted and agreed as follows, to-wit: * * *

"2.  That at all times during the continuance hereof, the title to the property sold and purchased hereunder shall be and remain in the Vendors herein, their heirs and assigns, but that the said Vendees shall be entitled presently to the possession of the said property, and thereafter while this contract shall remain in force and effect;

"3.  That as soon as abstract of title can be compiled covering the property sold and purchased hereunder, the Vendors

shall deliver the same to the Vendees for examination only and that when the said abstract shall have been examined by the said Vendees or their counsel, as the case may be, and established to the satisfaction of reputable attorneys that the Vendors have a merchantable title to the property agreed to be sold hereunder, that the said abstract shall be returned to the Vendors forthwith and that thereupon the said Vendors shall deposit with the Security Trust and Savings Bank at Billings, Montana, in escrow for the purposes of this contract, a deed that shall be legally sufficient to vest in the Vendees a merchantable title to the property agreed to be sold and purchased hereunder, together with the aforesaid abstract of title, with instructions to the said bank to deliver the said deed and abstract to the Vendees upon complete performance of all of the obligations of the Vendees under this contract; and that otherwise, the said deed and abstract shall be returned to the Vendors for cancellation; * * * and that it shall be sufficient for the purposes of this contract for the Vendors to deliver assignments or direct leases of or contracts covering such other property at the time the total sum of Forty-Three Thousand Five Hundred and 00/100 Dollars ($43,500.00) shall have been paid under this contract, subject to the obligations of the Vendees to assign the same back, upon demand of the Vendors, should this contract not become effective or be terminated in accordance with the provisions thereof; provided, however, that the Vendors shall have the right to substitute title insurance for the aforesaid abstract of title; * * *

"7. That inasmuch as the income from the property sold and purchased hereunder may be small for the calendar year 1953, the Vendees, during 1953, shall dispose of their portion of the cattle presently owned by them which they leave in the State of Nebraska after shipping the balance of the same to Grass Range, Montana, and that one-half (½) of the proceeds from the sale of the Nebraska cattle shall be applied by the Vendees forthwith, and be credited upon, the purchase price payable under this contract; * * *

"10. That upon the failure of the said Vendees to make any

of the payments required hereunder of principal or interest, taxes or insurance premiums, or to perform any of the covenants or agreements herein contained by the said Vendees to be paid, kept or performed, these presents, at the option of the Vendors, shall immediately cease and determine and be and become null, void, and of no force or effect whatsoever, and that such failure shall work a forfeiture of this contract, and that upon the termination of this contract upon any manner or breach thereof, the said Vendors shall immediately be and become entitled to the possession of the property and appurtenances here involved and that the said Vendees shall forthwith and immediately vacate the said property and appurtenances and deliver up the possession thereof to the said Vendors, and re-assign to the Vendors all of the rights to and in the property theretofore transferred to the Vendees hereunder; provided, however, that before any such forfeiture of this contract shall become effective, the Vendors shall give to the said Vendees, by registered letter addressed to them at Grass Range, Montana, which shall be deemed complete and legal service thereof, a thirty (30) day notice of their intention to forfeit and terminate this contract, which notice shall set forth the amount due under this contract or the amount of any taxes or insurance premiums unpaid or the other covenants and agreements not performed by the Vendees, and that full performance by the Vendees within the said thirty (30) day period, of their then existing obligations in default, shall reinstate this contract; * * *''

*Petition to Dissolve Attachment.* In their petition for an order dissolving the attachment defendants represent:

That upon giving a $10,000 undertaking on attachment filed in this action on a purported contract for the purchase of real property seeking to recover $28,500 and interest, virtually all of defendants' personal property of the approximate value of $80,000.00 and including 394 head of cattle, was attached and seized by the sheriff of Fergus County who still holds all thereof except 38 head of dry two year old heifers, some horses and

miscellaneous farming machinery theretofore released by Judge McConochie's order;

That the present value of the property still so attached is of the reasonable value of $57,558 exclusive of 186 head of suckling calves;

That plaintiffs and said sheriff have wholly failed and refused to make suitable or adequate provisions over substantial periods of time for the feeding, care or safety of said livestock;

That ever since said levy and seizure and to prevent great loss defendants have been obliged to devote practically their entire time to caring and providing for said livestock having provided pasture and large quantities of hay and feed;

That no arrangement has been made for the winter feeding, shelter and care of said livestock;

That defendants are barred and helpless to take over or take charge of their livestock so seized or to make arrangements for the winter shelter, feeding and care thereof;

That it is plaintiffs' purpose and intention to harass and embarrass defendants and to force and compel defendants to yield to plaintiffs' unlawful demands to the loss, harm, injury and damage of defendants;

That the $10,000 undertaking on attachment and the sheriff's official bond, combined are neither adequate nor sufficient to indemnify defendants for the accrued and accruing damages suffered by them by reason of the attachment of their property;

That the attachment is excessive, an abuse of process, unwarranted and unlawful;

That plaintiffs have no valid claim of indebtedness, express or implied, against defendants;

That no valid attachment has or can legally be issued herein;

That the records and files herein show that the only indebtedness claimed to be due plaintiffs from defendants is by virtue of the contract dated December 30, 1952;

That the contract upon which this action is based was a conditional, incomplete escrowed contract, the possession whereof plaintiffs wrongfully obtained;

That no rights have accrued nor may they accrue by virtue of the other purported contract above mentioned;

That both purported contracts expressly provide what rights, if any, accrue by virtue thereof in case of default by either of the contracting parties; that it appears therefrom and from the files and records herein that there is no indebtedness due plaintiffs but that their remedy, if any indebtedness had or should accrue by virtue of such purported contracts, was and is fixed by the parties themselves;

That under the express terms and conditions of said contracts in case of default by defendants said defendants forfeit any rights by virtue thereof, by reason of said contracts fixed by the parties themselves, namely:

(a) "* * * but if purchaser neglects or refuses to complete the purchase or shall fail to pay the balance of the purchase price as hereinabove provided * * this Agreement thereupon shall be of no further force or effect;"

(b) "* * * That upon the failure of the said Vendees to perform any of the covenants or agreements herein contained by the said Vendees to be paid, kept or performed, these presents * * * shall immediately cease and determine and be and become null, void, and of no force or effect whatsoever, and that such failure shall work a forfeiture of this contract, and that upon the termination of this contract upon any manner or breach thereof, the said Vendors shall immediately be and become entitled to the possession of the property * * * here involved and that said Vendees shall forthwith and immediately vacate the said property * * * and deliver up the possession thereof to the said Vendors, and reassign to the Vendors all of the rights to and in the property theretofore transferred to the Vendees hereunder";

And that plaintiffs' rights are limited and restricted to the recovery of said property clear of all claims of defendants.

*Hearing.* At the hearing on the above petition to dissolve the attachment the defendant Evan Owens and both the sheriff and the county attorney of Fergus County testified for the pe-

titioning defendants while no witness testified on behalf of plaintiffs.

R. C. M. 1947, sec. 93-4301, provides: "The plaintiff * * * may have the property of the defendant attached * * * as in this chapter provided, as follows:

"In an action upon a contract, express or implied, for the direct payment of money, where the contract is not secured by any mortgage or lien upon real or personal property, or any pledge of personal property, or, if originally secured, such security has, without any act of the plaintiff, or the person to whom the security was given, become valueless, and in an action based upon a statutory stockholders' liability."

R. C. M. 1947, sec. 93-4302, provides: "The clerk of the court must issue the writ of attachment, upon receiving an affidavit by or on behalf of the plaintiff, showing:

"1. That such defendant is indebted to the plaintiff (specifying the amount of such indebtedness over and above all legal counterclaims) upon a contract, express or implied, for the direct payment of money, and that the payment of the same has not been secured by any mortgage or lien upon real or personal property, or any pledge of personal property, or, if originally so secured, that such security has, without any act of the plaintiff, or the person to whom the security was given, become valueless; and,

"2. That the attachment is not sought, and the action is not prosecuted, to hinder, delay, or defraud any creditor of the defendant."

R. C. M. 1947, sec. 93-4327 provides that the defendant may apply to the court for an order to discharge the attachment wholly or in part.

R. C. M. 1947, sec. 43-4329 provides: "The defendant may also at any time, * * * apply on motion * * * to the court * * * or to a judge thereof, that the writ of attachment be discharged on the ground that the same was improperly or irregularly issued."

At the hearing on defendants' motion to dissolve the attachment most of plaintiffs' objections to the evidence offered by

defendants relative to the execution of the contracts and compliance with the provisions thereof by the parties were sustained, the court holding that the only question was whether the attachment was improperly or irregularly issued.

However there is evidence to the effect that the contract to sell the real property was signed on December 30, 1952 and that on May 12, 1953, plaintiff R. B. Fraser and the defendant Evan Owens held a conference relative thereto at Lewistown, Montana, at which time plaintiffs had not complied with the contract requirements on their part to be kept and performed.

In Ancient Order of Hibernians, Division No. 1, of Anaconda v. Sparrow, 29 Mont. 132, 74 Pac. 197, 198, 64 L. R. A. 128, an indemnity bond for $3,500 was given by White, a contractor, for the faithful performance of a building contract. The bond was signed by the defendant Sparrow and three other sureties. The condition of said bond was that: " 'If the said Edward B. White shall in all things comply with the conract in letter and spirit, and turn over to the said A. O. H. Div. No. 1 of Anaconda the said building fully finished and completed in all its parts in strict compliance with the said plans and specifications, * * * then the above obligation to be void, otherwise to remain in full force and virtue.' " The contractor White abandoned his contract before it was completed and the owner of the building who had to complete it at considerable cost recovered a judgment against White for $5,440 for such breach of the contract. Thereafter, White having been adjudged a bankrupt, action was brought to recover against the sureties on the bond. Upon commencing the action the plaintiff obtained a writ of attachment by the authority whereof property belonging to the defendants was seized and defendants interposed a motion for an order to discharge the attachment, "upon the ground, among others, that the action is not founded upon a contract for the direct payment of money within the meaning of sections 890 and 891 of the Code of Civil Procedure. [Now sections 93-4301 and 93-4302, R. C. M. 1947.]" In affirming the order of the district court discharging the attachment, this court said: "Before 1895

an attachment could be had in every action upon a contract, express or implied, for the payment of money, where the debt was not secured. Since then the writ can only issue in those cases arising on contracts, express or implied, for the *direct* payment of money, and applying the definitions of the term 'direct' as given above, the obvious intention of the Legislature can be made plain. The contracts now contemplated by section *890* [now section 93-4301, R. C. M. 1947], above, are such only as require the payment unconditionally and absolutely of a definite sum.''

Ancient Order of Hibernians, Division No. 1, of Anaconda v. Sparrow, supra, has been cited and followed in the following Montana decisions: Beartooth Stock Co. v. Grosscup, 57 Mont. 595, 600, 189 Pac. 773; Carter v. Bankers' Ins. Co., 58 Mont. 319, 326, 192 Pac. 827; Heffron v. Thomas, 61 Mont. 10, 14, 201 Pac. 572; Square Butte State Bank v. Ballard, 64 Mont. 554, 562, 210 Pac. 889; Muri v. Young, 75 Mont. 213, 216, 245 Pac. 956; Mitchell v. Banking Corporation, 83 Mont. 581, 596, 273 Pac. 1055; General Finance Co. v. Powell, 112 Mont. 535, 540, 118 Pac. (2d) 751, 753.

In General Finance Co. v. Powell, supra, in discussing the word ''direct'' as used in said section 93-4301, supra, this court said: ''Therefore there can be no doubt that the legislature attached some substantial meaning to the word. 'Direct' is defined by Webster's New International Dictionary (Webster-Merriam 2d Ed.) as denoting 'the absence of any intervening medium or influence'; as meaning 'marked by the absence of an intervening agency or influence.' Obviously defendant's guaranty of the purchaser's performance of the conditional sales contract is not a contract for the direct payment of money, since defendant's liability is conditioned entirely upon an intervening medium, agency or influence—namely, upon the purchaser's default, which as to eventuality, time and amount was entirely problematical. If it is to be construed as a contract for the direct payment of money, it is hard to imagine any contract for the payment of money which is not for its direct payment.

"This court has long held that the term meant an unconditional and absolute obligation to pay money * * *."

Section 537, subd. 1, Code of Civil Procedure of California is substantially the same as R. C. M. 1947, sec. 93-4301, supra, and in the recent case of Lencioni v. Dan, 128 Cal. App. (2d) 105, 275 Pac. (2d) 101, 105, involving a written contract for the sale of real and personal property, in reversing the order of the trial court denying defendants' motion for an order discharging an attachment procured and levied upon defendants' property by the vendor, the court said: "It must be held, therefore, that the contract was an executory contract of sale under the terms of which respondents retained title as security for the payment of the purchase price. This being so, the contract was one expressly providing for security within the meaning of section 537, subdivision 1, of the Code of Civil Procedure, and the attachment should have been discharged."

In the Lencioni case, supra, the appellate court cited the case of Title Guarantee & Trust Co. v. Stahler, 15 Cal. App. (2d) 239, 59 Pac. (2d) 515, 516, in which case it is said: "The first point urged upon this appeal is that the court erred in refusing to vacate this attachment. In that appellant is correct.. The vendor, under an executory contract for the sale of real property, having retained title as security for the purchase price, is not entitled to an attachment." See cases 5 Cal. Jur. 2nd, sec. 26, page 628 and sec. 27, page 631.

The contract involved in the instant case provides that when the abstract of title is furnished by the vendors and approved by the vendees, that such abstract shall be returned to the vendors forthwith, and that thereupon the vendors shall deposit with said Security Trust and Savings Bank, in escrow for the purpose of such contract, a deed that shall be legally sufficient to vest in the vendees a merchantable title to the property agreed to be sold, together with said abstract of title, "with instructions to said bank to deliver the said deed and abstract to the vendees upon complete performance of all the obligations of the vendees under this contract; and that otherwise, the said deed

and abstract shall be returned to the vendors for cancellation.''

Paragraph 10, supra, of the contract further provides that upon failure of the vendees to make any of the payments required of principal or interest, taxes or insurance premiums, that the contract, at the option of the vendors shall immediately become null and void of no force or effect whatever, and the vendors shall immediately be and become entitled to the possession of the property.

Such provisions of the contract clearly provided a remedy for and security to the vendors for a breach thereof and under the provisions of R. C. M. 1947, sec. 93-4301, precluded a rightful attachment and seizure of defendants' personal property in an action upon the contract upon which this suit was brought.

In accord with the above cited authorities we hold that the contract sued upon was not one for the direct payment of money and that the payments due under such contract were secured by the provisions of the contract. The order of the district court denying defendants' motion to dissolve and discharge the attachment is set aside and reversed, the attachment is hereby dissolved and discharged and the cause remanded to the district court for further proceedings not inconsistent herewith. Remittitur will issue forthwith.

MR. JUSTICES ANGSTMAN, ANDERSON and BOTTOMLY, concur.

MR. JUSTICE DAVIS (dissenting):

I think that this appeal is properly before us on a record certified in substantial compliance with R. C. M. 1947, sections 93-8017 and 93-5508; but on the merits I do not agree with the conclusion which the majority has reached in its opinion.

I shall of course confine myself to a discussion alone of the two narrow questions which that opinion answers. Moreover, in doing so I shall indicate but shortly the grounds of my disagreement; upon the details of that disagreement I shall not elaborate.

More than a half century ago our attachment statutes were enacted as section 890, et seq., Code of Civil Procedure, 1895. No chapter of our Codes since has been more constantly read, interpreted and applied by the bench and the bar of this state than that dealing with the writ of attachment. No part of our adjective law at this date should be better understood alike by judge and lawyer in Montana than R. C. M. 1947, sec. 93-4301, which stipulates when a plaintiff may have the property of a defendant attached. It is a reproach to our law that confusion is to be found here at this late date.

Yet at bar this court is again wrestling with what are fundamentally the same questions answered some fifty years ago in Ancient Order of Hibernians, Division No. 1, of Anaconda v. Sparrow, 29, Mont. 132, 74 Pac. 197, 64 L. R. A. 128, 101 Am. St. Rep. 563, which the majority opinion cites, and forty years ago in State ex rel. Malin-Yates Co. v. Justice of Peace Court, 51 Mont. 133, 149 Pac. 709, which the majority does not mention. A generation later Gilna v. Barker, 78 Mont. 343, 254 Pac. 169, first applied the reason and the rule of the Sparrow decision to a bilateral contract, which we have in this case, and defined for us on this appeal, I think, what our statute, sec. 93-4301, supra, means in this case when it speaks of a "contract, express or implied, for the direct payment of money". To read the record at bar in the light of our conclusion in the Barker case, which also the majority does not mention, is to answer the first question before us, as I see it. None of the citations in the majority opinion touches the facts of that record, or of that precedent.

Consistent with Gilna v. Barker, supra, the action here is upon an express contract for the direct payment of a specific sum of money alleged to be presently due. The attachment levied should therefore be sustained, unless we are to consider and rule the merits of the action itself. This I take it the majority agrees, we may not do at this time.

Likewise the Malin-Yates decision supplemented by Smith v. Bunston, 72 Mont. 535, 234 Pac. 836, has been accepted up to this time without dissent as controlling of the interpretation to

74

be put in this court upon the words "not secured by any mortgage or lien upon real or personal property," etc., also found in section 93-4301, supra. Consistent with the Malin-Yates and Bunston cases the contract upon which the action here is brought is not secured within the meaning of the statute cited. With these authorities unchallenged in this court I am at a loss to understand why we should look to the California courts for comfort or support. Compare Holt v. Sather, 81 Mont. 442, 455, 456, 264 Pac. 108.

The plainest principles, it seems to me, of the rule of *stare decisis* apply to the appeal now before us. The decisions to which I have called attention unmentioned by the majority should be followed; the order which the majority has reversed will then be upheld. Time has foreclosed any proper inquiry today into the questions here considered, which have both been authoritatively answered by this court long since.

I seriously doubt whether either question which the majority opinion has decided is properly presented by the motion made in the trial court to dissolve and by the proceedings had at the hearing there on that motion. But I lay these doubts aside in reaching the conclusion to which I have come in this matter. I would affirm the order of the *nisi prius* judge, and, as I read the record, upon substantially the same grounds which he found good insofar as he had the opportunity to consider and pass upon them.